UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROCHELLE JACKSON O/B/O A.J.[1],  )
                          )
       Plaintiff,         )
                          )     No. 4:07CV00546 FRB
                          )
       v.                )
                          )
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,         )
                          )
       Defendant.        )


**MEMORANDUM AND ORDER**


       This matter is on appeal for review of an adverse ruling by the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.   Procedural Background**

       On June 21, 2005, plaintiff Rochelle Jackson filed an application for Supplemental Security Income ("SSI") payments on behalf of her daughter, A.J.,[2] alleging disability as of May 1, 2003[3] due to asthma and allergies. (Administrative Transcript

---

[1]Because of her minority, plaintiff's daughter is identified herein by her initials, A.J., only.

[2]The record indicates that A.J. was born on December 20, 2002. (Administrative Transcript at 91.)

[3]As the Commissioner correctly notes, in Title XVI cases, the date of alleged disability is not particularly relevant, as plaintiff herein must prove that A.J. was disabled while her application was pending. 42 U.S.C. § 1382c; 20 C.F.R. §§ 416.330, 416.335.

("TR") at 47-49.) Plaintiff's application was initially denied, and she requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 41.) ALJ J. Pappenfus conducted a pre-hearing conference on January 26, 2006, and an administrative hearing on May 30, 2006. (Tr. 256-75.) On August 7, 2006, ALJ Pappenfus issued her decision denying plaintiff's claims for benefits. (Tr. 10-21.) Plaintiff filed a Request for Review of Hearing Decision with defendant Agency's Appeals Council on September 11, 2006, and on January 25, 2007, the Appeals Council denied plaintiff's request for review. (Tr. 9; 3-5.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Hearing Testimony

At the prehearing conference on January 26, 2006, plaintiff requested a postponement in order to update the medical evidence in the record, and to seek legal counsel. (Tr. 258.) The ALJ elicited testimony from plaintiff regarding A.J.'s medical treatment providers and child care arrangements. (Tr. 258-60.) The ALJ then advised plaintiff that she should provide authorizations to obtain all medical records, and should also call A.J.'s child care provider to testify as a witness at the forthcoming hearing. Id.

During the hearing on May 30, 2006, plaintiff testified in response to questions from her attorney, Jeffrey Bunten. Plaintiff testified that A.J. was three years old, and lived with

her in her home in Florissant, Missouri.  (Tr. 266.)  Plaintiff

testified that A.J. last visited the emergency room for asthma in

December of 2005, and was hospitalized for three days.  (Tr. 268.)

Plaintiff testified that, since that time, A.J. had not been

hospitalized, but had visited the emergency room on at least three

or four occasions.  Id.  Regarding the nature of A.J.'s breathing

in between hospital visits, and the frequency and severity of

breathing difficulty, plaintiff and her attorney had the following

exchange:

> Question (by plaintiff's attorney)  H o w   w o u l d   y o u
> describe her breathing in between these emergency room
> visits?
>
> Answer (by plaintiff)    She has this rattling in her
> chest, real shortage of breath.  Like she gasping for
> air.
>
> Q.    How often is that occurring?
>
> A.    From last year until, up until now just period,
> during an asthma attack, it's I mean just as far as her
> not - - just how often has that happened or - -
>
> Q.    No, between June of 2005 and today how often would
> you describe, or how often would you say this rattling
> that you've described occurred?
>
> A.    Oh, this was a constant thing.  This was probably -
> - this - - now that there is basically a monthly thing,
> especially due to the change of weather.
>
> Q.    And other than the change of weather was there any
> other triggers that you noticed that  - -
>
> A.    Yes
>
> Q.    - - lead to this rattling you've described?
>
> A.    Yes.
>
> Q.    What sort of other triggers were there?

A.   Allergy.

Q.   Were there specific things?

A.   Um-hum, food, grass, I mean she just has allergies so bad, anything triggers that so - -

Q.   Could you be a little more specific than anything?   What specific allergies has she been diagnosed with if you know?

A.   She has.   She's taken a test.   So far it's grass, fish, eggs, pollen, you know, the - - when the mold is up high.

(Tr. 268-69.)

Plaintiff testified that A.J. had taken a medication like Prednisone[4] on three to four occasions since June of 2005 and the date of the hearing and that, on each occasion, had remained on the medication for three to five days.   (Tr. 269-70.)   Plaintiff testified that A.J.'s asthma was "fairly okay" and that she did well as long as she took daily medication, which she listed as Flovent,[5] Albuterol,[6] and Singulair.[7]   (Tr. 270.)   Plaintiff

---

[4]Prednisone is a corticosteroid used to treat symptoms associated with low corticosteroid levels, and is also used to treat severe allergic reactions, multiple sclerosis, lupus, and certain conditions that affect the lungs, skin, eyes, kidneys blood, thyroid, stomach, and intestines.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601102.html

[5]Flovent, or Fluticasone oral inhalation, is a corticosteroid used to prevent breathing difficulties, chest tightness, wheezing and coughing caused by asthma.   It works by decreasing swelling and irritation in the airways to allow for easier breathing.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601056.html

[6]Albuterol is a bronchodilator used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease (COPD; a group of diseases that affect the lungs and airways).
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a607004.html

[7]Singulair, or Montelukast, is used to prevent breathing difficulties and other symptoms associated with asthma and with exercise.   It is also used to treat the symptoms of seasonal and perennial allergies.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a600014.html

testified that A.J.'s medications caused no side effects other than a faster heart rate and hyperactivity.[8]  (Tr. 272-73.)  The ALJ asked plaintiff whether the medicine helped A.J. when she was playing outside, and plaintiff replied, "[f]or the most part the medicine does work, but going outside, that's a no because either it's too hot or she [sic] allergic to the grass and that triggers the asthma, you know."  (Tr. 273.)

Plaintiff testified that A.J.'s pediatrician had voiced no concerns over A.J.'s asthma, but had referred them to an allergy specialist at Cardinal Glennon Hospital.  (Tr. 271.)[9]

Plaintiff testified that A.J. was shy and was unable to identify primary colors, but could recite her ABC's; count from one to ten; talk; and communicate at a three-year-old level.  (Tr. 271-72.)  Plaintiff testified that A.J. could walk well, but experienced shortness of breath while running.  Id.  Plaintiff testified that A.J. could hold a cup and spoon, and was toilet trained.  (Tr. 272.)

B.  Medical Records

The record indicates that A.J. was seen on several occasions by her pediatrician Danielle St. Leger, M.D., at the St. Leger Children's Clinic from January 3, 2003 through July 9, 2005.  (Tr. 89.)  A.J. was routinely vaccinated, and had "well infant" check-ups.  (Tr. 89, 94.)  It was noted that Dr. St. Leger saw her

---

[8]Plaintiff later attributed these symptoms to Albuterol.  (Tr. 273-74.)

[9]As will be discussed, infra, the record indicates that, on February 2, 2005, A.J. was seen by Bradley A. Becker, M.D., in the Pediatric Allergy and Immunology clinic of Cardinal Glennon Children's Hospital, and underwent allergy skin testing.

on February 22, 2003 for contact dermatitis; on April 26, 2003, August 27, 2003, and December 10, 2003 for a middle ear infection; and on January 22, 2003, April 26, 2003 and July 9, 2005 for upper respiratory infection. (Tr. 89.) Dr. St. Leger also saw A.J. on September 27, 2003, April 17, 2004, and December 17, 2004 for asthma; and on January 10, 2004, April 17, 2004, and December 17, 2004 for allergies. Id.

A.J. was seen in the emergency room at St. Louis Children's Hospital ("Children's Hospital") on March 31, 2003 with symptoms of cough and congestion, difficulty breathing, and insomnia, and was diagnosed with a middle ear infection and an upper respiratory infection. (Tr. 116, 251.) It was noted that A.J.'s lungs were normal. Id. Amoxicillin[10] was prescribed, and it was recommended that a vaporizer be used. Id.

A.J. returned to Children's Hospital on April 3, 2003 with complaints of breathing difficulty, and was diagnosed with bronchitis. (Tr. 112, 115, 242.) A chest x-ray taken on that date revealed that A.J.'s lungs were mildly hyperinflated, with no pulmonary infiltrates or consolidation. (Tr. 110, 247.)

The record indicates that A.J. presented to Cardinal Glennon Children's Hospital ("Cardinal Glennon") on October 27, 2003 with complaints of wheezing and coughing for three days. (Tr. 106.) It was recommended that A.J. take Albuterol four times daily. Id.

---

[10]Amoxicillin is an antibiotic used to treat certain infections caused by bacteria, such as pneumonia and bronchitis, and infections of the ears, nose, throat, urinary tract, and skin.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a685001.html

A.J. returned to Cardinal Glennon on May 24, 2004 with complaints of a bumpy rash. (Tr. 100.) She was diagnosed with contact dermatitis, and prescribed hydrocortisone cream. Id.

A.J. presented to the Children's Hospital emergency room on July 17, 2004. (Tr. 233.) She was diagnosed with an upper respiratory infection, asthma exacerbation, and eczema; given Orapred (prednisone), Albuterol and Hydrocortisone ointment, and discharged. Id. She was seen again in the Children's Hospital emergency room on July 27, 2004 and diagnosed with an asthma exacerbation and eczema. (Tr. 126-27.)

A.J. presented to the Children's Hospital emergency room on November 20, 2004 with facial swelling, and it was reported that she had eaten fish. (Tr. 225-26.) It was noted she was taking no medications, and her lungs were normal. (Tr. 225.) She was diagnosed with an acute allergic reaction, and given Orapred, Albuterol and Benadryl.[11] (Tr. 225, 229.)

Dr. St. Leger referred A.J. to the Allergy/Immunology clinic at Cardinal Glennon, and on February 2, 2005, A.J. was seen by Bradley A. Becker, M.D., in the Pediatric Allergy and Immunology clinic of Cardinal Glennon. (Tr. 95; 84-87.) Plaintiff was interviewed, and described several occurrences in which A.J. had suffered an allergic reaction after eating eggs, grapes, and breaded fish. (Tr. 85.) Plaintiff indicated that A.J.'s consumption of eggs and fish had caused facial swelling, redness

---

[11]Benadryl (Diphenhydramine) is used to treat various symptoms of allergies and the common cold; cough caused by minor throat or airway irritation; motion sickness; and insomnia.
ttp://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682539.html

and hives, along with wheezing, but that A.J.'s consumption of grapes had caused the same constellation of symptoms with no wheezing. Id. Plaintiff reported that A.J. had begun wheezing at age three months and had wheezed at least ten times since then, and had visited the emergency room on three to five occasions. Id. Plaintiff also stated that A.J. coughed once or twice daily, and experienced nocturnal cough 10 to 14 times per month. Id. Plaintiff also reported that, since age six months, A.J. had had eczema rashes on her elbows, the backs of her legs, and her left flank. (Tr. 85.) Dr. Becker noted that A.J. was taking Albuterol as needed, and using Mometasone ointment[12] two to three times per week. Id.

Upon exam, Dr. Becker noted that A.J. was in no acute distress, but had a patch of dry skin on her left flank. (Tr. 86.) The remainder of A.J.'s physical exam was largely normal. Id. Skin testing revealed allergies to egg, cod fish, and mold. Id. A.J. was diagnosed with moderate persistent asthma, atopic dermatitis, and food allergies to fish and egg. Id. Dr. Becker prescribed Flovent and Singulair, continuation of Albuterol as needed, and recommended the avoidance of allergens. (Tr. 87.)

A.J. presented to the Children's Hospital emergency room on August 27, 2005 with complaints of coughing since the preceding

---

[12]Mometasone Furate is used to relieve the itching and inflammation of numerous skin conditions.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a687014.html

night; and vomiting, choking, and nasal congestion. (Tr. 212, 214.) She was noted to be alert and well. (Tr. 212.) Physical exam was normal, and no wheezing was noted. (Tr. 214.) She was diagnosed with asthma and given Albuterol, Singulair, and Orapred, and advised to re-start Flovent when finished with Orapred. (Tr. 218.)

A.J. presented to the Children's Hospital emergency room on September 4, 2005 with a history of coughing and wheezing for ten days. (Tr. 199-200.) She was diagnosed with asthma, unspecified; acute upper respiratory infection; and a common cold. (Tr. 206.) Chest x-ray was normal. (Tr. 210.) Exam revealed mild bilateral wheezing. (Tr. 201.) She was treated with Albuterol, and was discharged from the emergency room in stable condition. (Tr. 204-05.)

A.J. was admitted to Children's Hospital on December 24, 2005 with a five-day history of fever, and cough, congestion, and runny nose. (Tr. 130-31.) According to plaintiff, A.J. was not in obvious respiratory distress. (Tr. 130.) In the emergency room, A.J. was noted to be wheezing. (Tr. 130, 151.) It was noted that this was A.J.'s first hospitalization, and that she was taking Albuterol and Singulair. (Tr. 130, 152.) Plaintiff reported that A.J. had not been wheezing before the Friday preceding hospitalization. (Tr. 130.)

Physical exam was normal with the exception of mild congestion and wheezing, and a middle ear infection. (Tr. 130,

151.) Chest x-ray revealed clear lungs with no pneumothorax or pleural effusion, pulmonary edema, or pneumonia, and a normal heart. (Tr. 131, 195.)

Upon admission, A.J. underwent Albuterol nebulizer treatments and was given Orapred; and was also given Amoxicillin for her ear infection. (Tr. 131.) She was discharged on December 27, 2005. (Tr. 130.) It was noted that, overall, A.J. was comfortable and progressed well throughout her hospitalization; that she improved; was alert and playful; and her respiratory status improved. Id. It was noted that, although it was believed that the trigger of the attack was viral, A.J.'s baseline symptoms were indicative of possible moderate persistent asthma, uncontrolled. Id. A.J. was stable at discharge, and was advised to continue Singulair, Amoxicillin, Flovent, and Orapred. (Tr. 131.) It was advised that A.J. follow up with her pediatrician, and use an EpiPen[13] if there were any signs of an allergic reaction. (Tr. 131, 142.)

III.    **The ALJ's Decision**

The ALJ found that A.J. had never engaged in substantial gainful activity. (Tr. 16.) The ALJ determined that A.J.'s impairment was "severe" but did not meet or medically equal the requirements of any listed impairment, including but not limited to

_____

[13]An EpiPen, or Epinephrine injection, is used to treat life-threatening allergic reactions caused by insect bites, foods, medications, latex, and other causes.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603002.html

Listing 103.02 for chronic pulmonary insufficiency, or Listing
103.03 for asthma.  (Tr. 17.)[14]  The ALJ further determined that
A.J.'s impairment did not functionally equal any listed impairment.
(Tr. 20-21.)  In so determining, the ALJ listed each of the six
domains and discussed each in detail.  (Tr. 17-20.)  The ALJ
considered plaintiff's testimony in light of the evidence on the
record as a whole, and concluded that plaintiff's testimony could
not be fully credited.  (Tr. 21.)  In so doing, the ALJ cited
Social Security Ruling 96-7p, which tracks <u>Polaski v. Heckler</u>, 739
F.2d 1320, 1321-22 (8th Cir. 1984) and the Regulations governing
credibility determination.  (Tr. 20.)  The ALJ concluded that A.J.
had not been under a "disability" as defined in the Social Security
Act at any time through the date of the decision.  (Tr. 21.)

**IV.     Discussion**

A claimant under the age of eighteen is considered
disabled and eligible for SSI under the Social Security Act if she
"has a medically determinable physical or mental impairment, which
results in marked and severe functional limitations, and which can
be expected to result in death or which has lasted or can be

---

[14]At page 16 of the Administrative Transcript, the ALJ incorrectly
identified A.J.'s impairments as "depression and oppositional defiant
disorder".  Review of the remainder of the ALJ's decision, however, clearly
shows that the ALJ did not repeat the mistake, and instead correctly
identified A.J.'s impairment and analyzed it with specific references to the
medical records and other evidence.  The undersigned therefore concludes that
the error was a mere typographic or transcription error.  <u>See</u> <u>Quaite v.</u>
<u>Barnhart</u>, 312 F. Supp. 2d 1195, 1199-1200 (E.D. Mo. 2004) (whether
misstatement is typographical error is to be determined by reading
misstatement in context of entire opinion.)  The undersigned further notes
that plaintiff alleges no error as a result of this mistake.

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).

The Commissioner is required to undertake a three-step sequential evaluation process, found at 20 C.F.R. § 416.924(a), when determining whether a child is entitled to SSI benefits. At the first step, the Commissioner must determine whether the minor child is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner proceeds to the second step and determines whether the child's impairment or combination of impairments is severe. If so, the Commissioner proceeds to step three, at which he considers whether the impairment meets, medically equals, or functionally equals a disability in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing" or "the Listings"). If the child's impairment meets or medically equals a Listing, the child is disabled. A child's impairment is medically equal to a listed impairment if it is at least equal in severity and duration to the medical criteria of the listed impairment. 20 C.F.R. § 416.926(a).

If the child's impairment does not meet or medically equal a Listing, the Commissioner will assess all functional limitations caused by the child's impairment to determine whether it "functionally equals" a Listing. This analysis requires the Commissioner to assess the child's developmental capacity in the following six "domains": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with

-12-

others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.   See 20 C.F.R. § 416.926a(b)(1); see also Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 722 n. 4 (8th Cir. 2005).

In order for the child's impairment to functionally equal a Listing, it must result in "marked" limitations in two domains, or an "extreme" limitation in one domain.   20 C.F.R. § 416.926a. A marked limitation in a domain exists when the child's impairment seriously interferes with her ability to independently initiate, sustain, or complete activities.   20 C.F.R. § 416.926a(e)(2).   An extreme limitation exists when the child's impairment interferes very seriously with her ability to independently initiate, sustain, or complete activities.   20 C.F.R. § 416.926a(e)(3).   Extreme limitation is the rating given to the worst limitations.   Id. Absent a finding that the child's impairment functionally equals a listed impairment, the child is not disabled.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence.   42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).   Substantial evidence is less than a preponderance, but enough that a reasonable person would find  adequate to support the conclusion.   Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998).   In evaluating whether substantial evidence supports the decision, this Court must

consider evidence which supports the Commissioner's decision, as well as any evidence that fairly detracts from the ALJ's findings. Id.; see also Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991). However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139 F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) (citing Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989)).

In the case at bar, plaintiff claims that the ALJ failed to properly consider the Listing of Impairments at 103.03C, and failed to articulate a legally sufficient rationale for her conclusion that A.J.'s condition did not meet the Listing of Impairments at 103.03C. Plaintiff argues that the evidence of record documents that A.J. was diagnosed with wheezing; that plaintiff testified that A.J. wheezed; that A.J. used bronchodilators both during the day and at night; and underwent short courses of corticosteroids, and therefore meets the requirements under 103.03C. Plaintiff also argues that the ALJ's assessment of her credibility was insufficient and contrary to Polaski. In response, the Commissioner argues that substantial evidence supports the ALJ's decision.

A.    Credibility Determination

As noted above, the ALJ in this case only partially credited plaintiff's testimony regarding the severity of A.J.'s

symptoms and limitations.  Plaintiff herein alleges that the ALJ failed to properly consider plaintiff's credibility, especially with regard to her testimony concerning the frequency and severity of A.J.'s wheezing.  Plaintiff also contends that the ALJ's decision is legally insufficient with regard to Social Security Ruling ("SSR") 06-3p.  The undersigned disagrees.

"A claimant has the burden of proving that his disability results from a medically determinable physical or mental impairment."  Polaski, 739 F.2d at 1321.  However, because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect.  Polaski at 1321-22.  In Polaski, the Eighth Circuit addressed this difficulty and established the following standard for the evaluation of subjective complaints:

> "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions."
>
> Id. at 1322.

To determine whether the ALJ properly evaluated plaintiff's credibility, this Court must consider whether, according to Polaski, the ALJ considered all of the evidence relevant to plaintiff's allegations of A.J.'s symptoms, and whether that evidence contradicted plaintiff's account to the extent that the ALJ could discount her testimony for lack of credibility. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). Although the ALJ is not free to accept or reject subjective complaints based upon personal observations alone, she may discount such complaints if there are inconsistencies in the evidence as a whole. Id. An ALJ's credibility findings are entitled to deference as long as they are supported by good reasons and substantial evidence. Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003); see also Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The ALJ need only acknowledge and consider the Polaski factors, not explicitly discuss each one. Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004). Decisions regarding credibility are reserved primarily for the ALJ, not the courts, and this Court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In making her credibility determination, the ALJ in this case did not cite Polaski, but did cite SSR 96-7p, which tracks Polaski and the Regulations governing credibility determination. (Tr. 20.) The ALJ then set forth specific inconsistencies in the record as a whole detracting from plaintiff's credibility. The ALJ

noted plaintiff's testimony that A.J. was highly allergic to elements present outdoors, including grass, and that because of these allergies, going outside "was a no" because it triggered her asthma. The ALJ then noted that, during the hearing, A.J.'s aunt took her outdoors to a nearby pond to look at ducks. It is proper for an ALJ to consider discrepancies between subjective complaints and actual behavior as detracting from credibility. See Goodale v. Halter, 257 F.3d 771, 774 (8th Cir. 2001) (ALJ's credibility analysis properly included consideration of the fact that, despite claimant's statements that her hands hurt so badly that she could not hold a book for more than ten minutes and was also unable to drive, she reported to the Social Security Administration that she was an avid reader, and admitted that she had driven 60 miles to her hearing.)

The ALJ also noted that she observed no abnormality in A.J.'s breathing, despite plaintiff's testimony that A.J. exhibited a constant rattling noise when she breathed. An observation that a claimant demonstrated no evidence of impairment during the hearing is included as one of the legally sufficient reasons for discrediting testimony. See Long v. Bowen, 866 F.2d 1066, 1067 (8th Cir. 1989) (ALJ properly discredited claimant's testimony of a disabling condition after noting, inter alia, that the claimant demonstrated no evidence of a physical or emotional impairment during the hearing); see also Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007) (citing Johnson v. Apfel, 240 F.3d 1145, 1147–48

-17-

(8th Cir. 2001) (The ALJ's personal observations during the hearing are "completely proper in making credibility determinations."))

The ALJ noted that plaintiff testified that A.J.'s health was good as long as she took her medication every day. The ALJ also noted that, on A.J.'s application, plaintiff indicated that A.J.'s condition had not worsened since she was six months old. The ALJ found that the foregoing was consistent with the medical evidence of record, which documented only one hospitalization and normal radiological studies; and which also consistently documented that A.J.'s asthma responded to medication. The ALJ concluded that the medical evidence of record was not consistent with plaintiff's testimony concerning the chronic nature and severity of A.J.'s condition, including wheezing. Conditions that are controllable do not sustain a finding of disability. Scales v. Barnhart, 363 F.3d 699, 705 (8th Cir. 2004); Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999). Furthermore, it was proper for the ALJ to consider the lack of objective medical evidence supporting the level of disabling symptoms plaintiff described. McCadney v. Astrue, 519 F.3d 764, 766 (8th Cir. 2008); Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Kisling v. Chater, 105 F.3d 1255, 1257-58 (8th Cir. 1997).

The undersigned also notes that, despite plaintiff's testimony that A.J. consistently exhibited a "rattling sound" while breathing, several of A.J.'s medical examinations support the conclusion that A.J. did not experience low-grade wheezing between

-18-

acute asthma attacks.  When A.J. visited the emergency room on May 24, 2004, her only complaint was a skin rash.  Plaintiff did not report that A.J. had been wheezing, nor was A.J. found to be wheezing during physical examination.  On November 20, 2004, A.J. presented with complaints of facial swelling, and no wheezing was noted or reported.  When A.J. was seen by Dr. Becker on February 2, 2005, plaintiff reported that A.J. first wheezed at age three months (which, considering A.J.'s December 20, 2002 birth date, would have been a little more than two years before her visit to Dr. Becker) and had wheezed "at least ten times" since then.  This is not entirely consistent with plaintiff's hearing testimony that A.J. wheezed constantly.

Particularly relevant are the following medical records, which post-date the filing of A.J.'s application.  During her August 27, 2005 emergency room visit, no wheezing was noted or reported; and when A.J. was admitted to Children's Hospital on December 24, 2005, plaintiff indicated that A.J. had not begun wheezing until the Friday preceding her admission.  This is also inconsistent with plaintiff's testimony that A.J. constantly wheezed between asthma attacks.

The undersigned further notes that A.J.'s asthma exacerbations were consistently resolved with medication, and that, each time plaintiff visited the hospital, she was discharged home in stable condition.

Regarding plaintiff's contention that the ALJ failed to

articulate a legally sufficient rationale with regard to SSR 06-3p, the undersigned finds no error. On August 9, 2006, the Social Security Administration issued SSR 06-3p. The ruling clarified how it considers opinions from sources who are not what the Agency terms "acceptable medical sources." The Agency separates information sources into two main groups: "acceptable medical sources" and "other sources." It then divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902. Plaintiff's focus appears to be that the ALJ failed to properly consider her testimony concerning A.J.'s wheezing. However, as discussed above, the undersigned finds that the ALJ properly considered plaintiff's testimony and discredited her allegations after undertaking the proper analysis. To the extent that plaintiff is arguing that her opinion was not properly considered as an "other" source, the undersigned notes that the ALJ properly considered plaintiff's testimony, as discussed above.

Examination of the record as a whole supports the ALJ's credibility determination. The ALJ in this case made express credibility findings and, despite plaintiff's assertion, gave multiple valid reasons for discrediting plaintiff's testimony regarding A.J.'s symptoms and limitations. The ALJ's failure to specifically cite <u>Polaski</u> does not defeat her credibility determination, inasmuch as she correctly listed the <u>Polaski</u> factors, and considered them in assessing plaintiff's credibility. <u>Holley v. Massanari</u>, 253 F.3d 1088, 1092 (8th Cir. 2001) (Even

though ALJ did not cite <u>Polaski</u>, his credibility determination was proper because he cited the appropriate Regulations, listed the <u>Polaski</u> factors, and considered them in his credibility analysis.) The ALJ's credibility findings are consistent with <u>Polaski</u> and are supported by good reasons and substantial evidence, and are therefore entitled to deference. <u>Gregg</u>, 354 F.3d at 714.

    B.   <u>Listing 103.03C</u>

In this matter, the ALJ evaluated A.J.'s severe impairment under Listing 103.03, asthma. The ALJ found A.J.'s impairment did not meet or medically equal a Listing, and did not functionally equal the requirements of a Listing. Plaintiff challenges this finding, limiting her challenge to 103.03C. Plaintiff argues that A.J. meets the requirements of 103.03C inasmuch as she has the requisite wheezing, according to plaintiff's testimony, and because the medical evidence documents "near continuous" use of bronchodilators day and night, and use of corticosteroids. The undersigned disagrees.

The Listing of Impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments for each body system that, for children, cause marked and severe functional limitations.[15] 20 C.F.R. § 416.925(a). Section 103.03C of the Listing of Impairments provides as follows:

---

[15]For adults, the Listings describe impairments that are severe enough to prevent an individual from doing any gainful activity. 20 C.F.R. § 416.925(a).

C. Persistent low-grade wheezing between acute attacks or absence of extended symptom-free period requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:

1. Persistent or prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease;

or

2. Short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period;

20 C.F.R. Part 404, Subpart P, Appendix 1, § 103.03.

Plaintiff herein alleges error in the ALJ's failure to find that A.J. met the requirements for Listing 103.03C. In order to meet subsection C, A.J. must have (1) persistent low-grade wheezing between acute attacks, *or* (2) the absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators; *combined with* the criteria of either 1 or 2. An impairment cannot meet the criteria based on a diagnosis alone. 20 C.F.R. § 416.925(d). To meet the requirement of a Listing, the medically determinable impairment must meet all of the criteria of the Listing. Id.

The record fails to demonstrate that A.J. demonstrated either of the initial requirements of 103.03C, "persistent low-grade wheezing between acute attacks" or "the absence of extended symptom-free periods requiring daytime and nocturnal use of

sympathomimetic bronchodilators." Regarding A.J.'s alleged wheezing, as discussed in detail above, the ALJ properly discredited plaintiff's testimony that A.J. consistently exhibited a rattling sound while breathing. Also as discussed above, this determination was supported by the lack of medical evidence documenting persistent wheezing between acute asthma attacks.

The other initial requirement of § 103.03C is "the absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators". In her argument, plaintiff mentions this requirement, but does not allege the presence of any other asthma symptoms necessitating daytime and nocturnal use of bronchodilators, focusing instead on her allegations of persistent wheezing. Inasmuch as plaintiff does not mention other asthma symptoms, it is presumed that she alleges only wheezing, the persistence and severity of which, as discussed above, was properly discredited. Furthermore, although plaintiff told Dr. Becker that A.J. coughed once or twice a day and exhibited nocturnal cough 10 to 14 times per month, she did not indicate that the use of bronchodilators was required. The undersigned concludes that the medical evidence of record, combined with the ALJ's previously discussed decision to discredit plaintiff's testimony regarding A.J.'s wheezing, supports the ALJ's determination that A.J. did not experience the initial requirements of § 103.03C. Because the initial requirements were not met, it is unnecessary to consider whether A.J. met the requirements of either subsection 1

or 2, inasmuch as it is clear that, in order to be found to have met a Listing, all of the requirements must be met. 20 C.F.R. § 416.925(d).

Plaintiff also contends that the ALJ did not provide a legally sufficient rationale at this step. However, as the Commissioner notes, the Eighth Circuit has repeatedly held that an ALJ need not elaborate on the finding that a claimant does not meet a Listing, provided that such finding is supported by the record, as in the case at bar. See Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); see also Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001) (holding a failure to explain why the claimant did not meet the listing for rheumatoid arthritis was not an error); Briggs, 139 F.3d at 609 (stating that "although the ALJ did not specifically discuss [the] condition in the context of listing 112.05(D)," the record supported the conclusion).

Therefore, for all of the foregoing reasons, the undersigned concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole. Because there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a different outcome, or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001; Browning, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is hereby affirmed, and plaintiff's Complaint is hereby dismissed with prejudice.

Judgment shall be entered accordingly.

_____
FREDERICK R. BUCKLES
UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of September, 2008.